James M. Piotrowski
Marty Durand
HERZFELD & PIOTROWSKI, PLLC
P.O. Box 2864
Boise, Idaho 83701
Telephone: (208)331-9200
Facsimile: (208)331-9201
Email: James@idunionlaw.com
       Marty@idunionlaw.com

Attorneys for Plaintiffs,

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| D.T. and R.T. as guardians and next friends of L.T., <br><br> Plaintiffs, <br><br> vs. <br><br> RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare, <br><br> Defendant. | Case No. 1:17-cv-00248 <br><br><br> COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF |

COME NOW the Plaintiffs by and through undersigned counsel of record and for their complaint would show as follows:

**I. Nature of the Action**

1. Plaintiffs are the appointed guardians of L.T., an individual with profound intellectual disabilities who currently resides in an Intermediate Care Facility for the Intellectually Disabled ("ICF/ID") operated by the State of Idaho and known as Kyler House. The State, acting through its Department of Health and Welfare has announced its intent to close Kyler House, effective June 15, 2017. The State does not maintain any other ICF/ID's in Northern Idaho, and although there is a single ICF/ID provider in the area known as Region 1, that facility has not responded to

requests for information about services. There are no other medically appropriate placements for L.T., and, as a result he is likely to either end up being even further segregated from his own community and from the non-disabled community as a result of the closure since L.T. is left with the options of leaving his hometown, family, and school district, or accepting an inappropriate placement that, according to treatment professionals, will almost certainly result in incarceration. Such a decision, resulting in further segregation of a disabled individual, violates the integration mandate of the Americans with Disabilities Act, and therefore violates L.T.'s statutory rights, and should be enjoined until such time as an adequate placement for L.T. can be made.

## II. Parties, Jurisdiction and Venue

2. Plaintiffs R.T. and D.T. are individuals, residing in Coeur d'Alene, Idaho and are the parents and court-appointed guardians of L.T. L.T. is an individual adult, residing in Hayden, Idaho. Since the age of three years, L.T. has been diagnosed as autistic. According to determinations already made by employees and agents of the Idaho Department of Health and Welfare, L.T. is incapable of caring for himself in multiple ways. He has a capacity for independent care similar to that of an individual aged 3 years and 4 months, gross and fine motor skills typical of a toddler of 3 years and 8 months, and the social interaction and communication skills of someone 2 years and 10 months old. L.T., according to IDHW's own assessments, engages in many "problem behaviors" including "socially offensive" and "disruptive" behaviors that present a risk of hurting himself and others, the most serious of which is "sexual assaults."

3. Defendant Richard Armstrong is the Director of the Idaho Department of Health and Welfare (IDHW). IDHW has been granted authority to and does operate the South West Idaho Treatment Center. Armstrong is sued in his official capacity.

4. Plaintiffs bring suit pursuant to the Americans with Disabilities Act, the Rehabilitation Act, and other federal statutes. This Court has jurisdiction over these claims arising under federal law pursuant to 28 U.S.C. §1331, as well as pursuant to the statutes sued under.

5. The acts and omissions giving rise to this cause of action occurred in the State of Idaho, making this Court the appropriate venue to hear such claims.

### III. Background and Facts Giving Rise to the Claims

6. L.T. has been receiving medical and support services related to his autism since shortly after he was diagnosed at age three. From that time until about age 15, L.T. resided at home with his parents R.T. and D.T., and his younger sisters. Residing at home created unique challenges for L.T.'s family. L.T. requires 24-hour per day, one-on-one care from trained professionals. L.T. routinely attempts to flee the structured environments in which he lives. When away from that environment he engages in conduct that is perceived as anti-social such as approaching strangers closely enough to be perceived as a threat. This conduct has resulted in both L.T. and R.T. being assaulted and battered by members of the community who perceived L.T.'s approach and proximity as threatening and/or offensive. When encountering women and girls, L.T. is unable to regulate impulses and, if he is not accompanied by a trained care giver, will physically "grab" women in a manner that likely constitutes a sexual assault under Idaho penal laws. This conduct also resulted in public confrontations when L.T. was residing with his parents. R.T. and D.T. have two other children, daughters, both younger than L.T. While his younger sisters care for L.T. a great deal, having L.T. reside in the home created difficulties for them, as well.

7. For approximately four years, L.T. has resided in an Intensive Care Facility for the Intellectually Disabled (ICF/ID). The particular ICF/ID where L.T. resides is known as Kyler House and is in the city of Hayden, Idaho, and within the Coeur d'Alene School District. As a

resident of Kyler House, L.T. is cared for on a day to day basis by highly trained personnel with combined decades or experience in caring for individuals like L.T. as well as in redirecting and addressing L.T.'s problem behaviors.  L.T. has regular access to a psychiatrist who regulates and adjusts L.T.'s use of psychoactive medications. Kyler House is equipped with video monitoring and other equipment which greatly reduces the incidences of L.T. leaving the facility without supervision.

      8.  R.T., D.T., and L.T.'s entire team of care providers (which includes a psychiatrist, psychologist, educators, special education professionals, nursing providers, direct care staff, extended family and others) has created a therapeutic environment and program under which L.T. is thriving for the first time in his life.  Instances of attempted elopement have been greatly reduced, while actual elopements from care have been all but eliminated.  L.T.'s care plan includes a specific goal of reducing incidents of assault to no more than ten per month, and "level 1 sexual assaults" to zero per month for a period of 12 months.  L.T. is able to visit his grandmother and grandfather, who reside in Coeur d'Alene, on a regular basis.  R.T. and D.T. are likewise able to spend time with L.T. weekly.  L.T. enjoys positive and supporting relationships with his sisters, who attend the same school as L.T. and are able to see him on a near daily basis. While the risk of L.T.'s maladaptive behaviors landing him in trouble, including a probability of criminal charges, was previously quite high, the combination of therapies, treatments, and living arrangements has reduced the incidence of maladaptive behaviors, and all but eliminated the risk of L.T. committing sexual assaults and other potential crimes.

      9.  L.T. receives intensive education supports from the Coeur d'Alene School District and its Special Education Program pursuant to an Individual Education Plan.  As part of his Individual Education Plan, L.T. receives the services of a Special Education Teacher, a Behavior

4. Complaint

Intervention specialist, Occupational Therapist, Speech Language Pathologist and others. The particular array of services received from Coeur d'Alene School District are the result of years of effort on the part of educators, administrators, L.T.'s parents, care providers and others to develop the right program for L.T.

10. The combination of professional treatment, a controlled home environment and a highly personalized Individual Education Plan have created positive educational outcomes for L.T. L.T. has begun to achieve a degree of education success that had previously eluded him, and is learning basic skills that he will need once he "ages out" of the school environment at age 21.

11. In April, 2017, R.T. and D.T. were informed that SWITC intended to close Kyler House, and that L.T. and its other residents would have to find alternative placements for residential treatment. There were few options available for L.T. The treatment modalities for individuals with severe developmental disabilities include placement in a Certified Family Home ("CFH"), which is the home of an individual who provides room, board and treatment for an individual with disabilities; Supported Living, in which L.T. would rent an apartment or home and a Residential Habilitation Agency would provide staff to care for him; or placement in another ICF/ID similar to Kyler House. In reality, none of these is a realistic option for L.T.

12. CFH's are operated by individuals who agree to take on one or two individuals with disabilities. The vast majority of CFH's in Idaho provide care only for the family members of the CFH operator  (for instance, R.T. and D.T. could have their home certified as a CFH). R.T. and D.T. have considered this option, but they were less effective at caring for L.T. when he previously resided in their home than the staff at Kyler House, and that placement resulted in a

5. Complaint

much higher level of maladaptive and anti-social behaviors than L.T. has experienced since moving in to Kyler House.

    13. R.T. has contacted numerous Residential Habilitation agencies about Supported Living placements for L.T. The IDHW lists 10 Residential Habilitation Agencies as being authorized to do business in IDHW's Region 1, which includes Coeur d'Alene. Only 5 of those actually operate in Coeur d'Alene. One of those 5 agencies, Ambitions of Idaho, intends to take over the Kyler House physical property, but has informed R.T. that it is unable to provide care for L.T. Two others, Milestone Decisions, and Inclusion North (actually in Hayden) has informed R.T. that they are unable to provide care for L.T. R.T. has contacted other Residential Habilitation Agencies, but none has indicated a willingness to serve L.T. At this point, none of them even could implement care for L.T. by June 15, the date on which IDHW says it will close Kyler House.

    14. IDHW's website indicates that only one other entity operates ICF/ID's in Region 1, which includes Coeur d'Alene. This is an entity known as Seven Oaks. Seven Oaks operates several ICF/ID's in Post Falls, Idaho. R.T. has contacted Seven Oaks repeatedly to inquire whether they might be able to serve L.T., but has had no return contact.

    15. By letter dated May 31, 2017, IDHW informed R.T. that in the absence of a plan to transfer L.T. to another facility, the only options would be a transfer to SWITC's ICF/ID in Nampa, Idaho, or that L.T. would become homeless. The letter stated that IDHW would take steps to ensure L.T. did not become homeless, but gave no indication what those steps would be.

    16. If L.T. becomes homeless and does not have 24-hour one-on-one care, he is almost certain to commit illegal acts and end up jailed and then, likely, imprisoned.

17.  If L.T. is moved to a facility outside of Coeur d'Alene (at this point there do not appear to be any facilities within Coeur d'Alene that can provide service to L.T.), he is almost certain to suffer a loss of educational opportunity.  The current Individual Education Plan being implemented by Coeur d'Alene School District took years to develop, and for District staff to become skilled at implementing.  L.T. will lose the benefit of education if he is moved to a new district as any district would require years to become familiar with L.T. and his educational needs, and in two years, L.T. will age out of the school system.

18.  If L.T. is moved to a facility outside of IDHW's Region 1, which now appears almost certain to happen since none of the Region 1 providers has indicated they are willing and able to serve L.T., L.T. will lose the ability to spend significant amounts of time with family.  L.T. currently visits his grandparents on weekends, his parents during the week as well as on weekends, and sees his sisters at school as well as on weekends.  Placement in another Region would result in reducing these opportunities.  Placement at SWITC's Nampa facility would essentially eliminate these opportunities, as Nampa is a 7-hour drive from Coeur d'Alene, and L.T. is entirely incapable of utilizing public air transportation on his own.

19.  R.T. and D.T. have put substantial effort into finding an alternative placement for L.T. without success.

### IV.  Claim for Relief

20.  L.T. is a qualified individual with a disability within the meaning of the Americans with Disabilities Act's and the Rehabilitation Acts' provisions on public services.

21.  IDHW and SWITC are each a "department, agency, special purpose district, or other instrumentality" of the State of Idaho within the meaning of the Americans with Disabilities Act's and the Rehabilitation Acts' provisions on public services.  Both IDHW and SWITC

receive federal funding for portions of their activities, including the Medicaid program which provides services to L.T.

22. Kyler House, as an ICF/ID is the most integrated setting in which L.T. can receive the services and benefits offered through Idaho's Medicaid program. Providing such services within IDHW's Region 1, but outside of Coeur d'Alene would prevent L.T. from participating in his now-effective educational program, and instead require him to start a new program which would be less integrated and less effective for the simple reason that it is new and at the tail end of L.T.'s public education career, as well as preventing L.T. from interacting with non-disabled community members such as his sisters. Providing such services outside of Region 1 (such as at SWITC's Nampa facility) would provide L.T. a far less integrated setting. Outside Region 1, L.T. would be unable to engage in regular visits with his sisters, parents, and grandparents. He would necessarily spend more of his time with disabled members of the community, and less time with the non-disabled community at large.

23. The decision to close Kyler House, which was an operational decision by SWITC and IDWH will thus result in L.T. being forced to receive services in a less-integrated setting in violation of the Americans with Disabilities Act and the Rehabilitation Act and, in particular, in violation of the "integration mandate" expressed in 28 C.F.R. §35.130(d).

24. As a direct and proximate result of the foregoing, L.T. and his guardians are entitled to preliminary and permanent injunctive relief requiring IDHW and SWITC to provide services to L.T. in the most integrated setting possible that meets his needs.

WHEREFORE, Plaintiffs pray for relief as follows:

    a. For a preliminary injunction barring IDHW and SWITC from closing the facility known as Kyler House unless and until adequate, equally integrated services have been made available to L.T.;

    b. For a permanent injunction requiring IDHW and SWITC to ensure that services for all current residents of Kyler House, including L.T., will be available in the most integrated setting appropriate for each of them;

    c. For an award of fees and costs;

    d. For such other and further relief as the Court deems just and appropriate.

DATED this 6th day of June, 2017.

                                          HERZFELD & PIOTROWSKI, PLLC

                                          /s/ James M. Piotrowski
                                          James M. Piotrowski
                                          Attorneys for Plaintiffs