UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| D.T. and R.T., as guardians and next friends of L.T.,<br><br>        Plaintiffs,<br><br>   v.<br><br>RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare,<br><br>        Defendant. | Case No. 1:17-cv-00248-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Currently pending before the Court is Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order (Dkt. 4).[1] The Motion is fully briefed and ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds the decisional process would not be significantly aided by oral argument, the Motion shall be decided on the record before this Court without a hearing.

---

[1] Also pending before the Court are: Plaintiffs' Motion to Proceed Anonymously (Dkt. 3), Plaintiffs' Motion to Seal (Dkt. 5), Defendant's unopposed Request to Take Judicial Notice (Dkt. 11), and Defendant's unopposed Motion to Seal (Dkt. 18). The unopposed Request to Take Judicial Notice (Dkt. 11) is granted. The remaining motions will be determined in a separate order.

**BACKGROUND/ FACTS**

Plaintiffs, D.T. and R.T., are the parents and guardians of L.T., a nineteen-year-old man with profound intellectual and developmental disabilities. He will turn 20 in August 2017. (Dkt. 6-3.)

Defendant, Richard Armstrong, is the Director of the Idaho Department of Health and Welfare ("IDHW"). (Dkt. 1). Plaintiffs bring this action to enjoin the IDHW from closing Kyler House, an Intermediate Care Facility for the Intellectually Disabled ("ICF/ID") operated by IDHW in Hayden, Idaho. (Dkt. 1, Dkt. 4.) L.T. currently resides at Kyler House. (Dkt. 4). Plaintiffs argue L.T. will be irreparably harmed if the Kyler House is allowed to close on June 15, 2017 as planned. (Dkt. 4). Plaintiffs further argue that closing Kyler House under current circumstances violates the Americans with Disabilities Act and the Rehabilitation Act. (Dkt. 1, Dkt. 4.) Therefore, they seek a temporary restraining order and preliminary injunction prohibiting the closure of Kyler House until such time as closure can be accomplished without violating federal law. (Dkt. 4.) For the reasons set forth below, the Court denies the Plaintiffs' motion.

1.     **L.T.'s Background: from Expert Testimony of Dr. Derby**

Dr. Mark Derby is a licensed psychologist and Professor of Special Education at Gonzaga University. (Dkt. 6-6.) Dr. Derby's specialty is the assessment and treatment of intellectually impaired children with serious problem behaviors. (Dkt. 6-6.) Dr. Derby has provided services to L.T. and the Plaintiffs for 16 years and has known L.T. since preschool. (Dkt. 6-6.)

MEMORANDUM DECISION AND ORDER- 2

Learning has always been difficult for L.T., who is prone to elopement and does not do well in group settings due to extreme behavioral issues. (Dkt. 6-6.) This behavior includes physically assaulting others and "grabbing" females inappropriately. (Dkt. 6-6.) Without well-trained staff and ongoing behavioral intervention with trained staff, classroom learning is nearly impossible for L.T. (Dkt. 6-6.)

L.T. lived at home with his mother, father, and two younger sisters until he was 14 years old. (Dkt. 6-6, 14.) At that point, it became apparent that L.T. needed 24-hour care, a fact Defendant does not dispute. (Dkt. 6-6.) The parties agree that L.T. requires constant supervision with well-trained personnel and consistent staffing patterns. (Dkt. 6-6.)

Dr. Derby offers the opinion that L.T. requires ICF/ID level care. (Dkt. 6-6.) Plaintiffs moved L.T. to Kyler House to receive ICF/ID level care close to Plaintiffs' home. (Dkt. 6-6.) At Kyler House, D.T. receives comprehensive, round-the-clock, skilled care provided by highly trained care workers who implement a detailed program to assist L.T. (Dkt. 4-1, Dkt. 6-6.) His current treatment plan allows him to attend an educational program developed by and with the Coeur d'Alene School District, and to interact with his sisters, parents, and grandparents both at school and in the community. (Dkt. 4-1.)

Since moving to Kyler House, L.T.'s problem behaviors have significantly decreased and he is learning in school. (Dkt. 6-6.) However, L.T. will turn 20 in August 2017. The record is in conflict as to whether L.T. will receive services through the Coeur d'Alene School District until he is 20 or 21 years old. (Dkt. 6-6, ¶ 10.) Nevertheless, according to Dr. Derby, this two-month (or 14 month) period is "critical" for L.T. so he can learn as much as possible to ensure greater independence in his adult life. (Dkt. 6-6.)

MEMORANDUM DECISION AND ORDER- 3

2.      **Closure of Kyler House: Defendant's Perspective**

Kyler House is part of the Southwest Idaho Treatment Center ("SWITC"). (Dkt. 16.) Kyler House is not a community-based residential setting; it is an institutionalized environment and the most restrictive setting for an individual with intellectual and developmental disabilities in the IDHW system. (Dkt. 13, Dkt. 16.)

The mission of both Kyler House and SWITC is to serve as a last resort, safety-net placement for individuals with intellectual and developmental disabilities. (Dkt. 16.) Kyler House, like SWITC in Nampa, provides an institutionalized setting designed to provide short-term treatment and stabilization for individuals with intellectual and developmental disabilities who cannot be served in the community and cannot be stabilized in short-term crisis beds. (Dkt. 16.) This mission reflects an over-all IDHW policy in favor of community placement as opposed to long-term residential or institutionalized living. (Dkt. 16.)

When L.T. was first admitted to Kyler House, Plaintiff R.T. signed an Admission Agreement on behalf of L.T. (Dkt. 16-1.) Consistent with the IDHW's policy preference in favor of community placement, rather than institutionalized care, Plaintiff R.T. specifically agreed: (1) the reason for admission is to support the individual to develop the skills needed to return to a community placement and (2) when a community placement that can meet the needs of the individual is found or the services of SWITC are no longer needed, discharge to a more appropriate facility will be initiated. (Dkt. 16-1.)

Kyler House is a duplex in a residential neighborhood built and owned by a private entity and leased to IDHW. (Dkt. 16.) Consistent with its stated mission, Kyler House was designed to provide eight beds: two crisis beds and six short-term stabilization beds. (Dkt.

MEMORANDUM DECISION AND ORDER- 4

16.) The intent was for Kyler House to serve all individuals in northern Idaho who experienced a crisis and could not maintain their community placement. (Dkt. 16.)

Nevertheless, Kyler House was unable to fulfill its intended mission and, instead, became a long-term residence for minors and youth with difficult behaviors. (Dkt. 16.) The flaws that prevented Kyler House from fulfilling its intended mission include: (1) it was located in a residential neighborhood presenting a risk of having volatile clients near vulnerable community members; (2) Kyler House was filled with minors making it difficult to place difficult adults there; (3) because the duplex was built to serve as a residence, it is vulnerable to extensive damage from violent or self-abusive clients; and (4) the building has blind spots and areas of easy egress, making clients and staff vulnerable to assault. (Dkt. 16.) As a result of these flaws, the adults Kyler House was intended to serve were transferred to SWITC in Nampa. (Dkt. 16.)

The Kyler House lease is set to expire on July 31, 2017. (Dkt. 16.) IDHW did not exercise its option to renew that lease and, instead, made a decision to close Kyler House. (Dkt. 16.) Between the closure date of June 15, 2017 and lease expiration on July 31, 2017, the IDHW intends to return the Kyler House property to the state it was when the lease first began. (Dkt. 16.)

Rather than continue to operate Kyler House, IDHW decided that it would be less expensive to serve the minors and young adults currently residing at Kyler House in a community Intermediate Care Facility or another community based placement. (Dkt. 16.) As a result of Kyler House closing, SWITC in Nampa will now serve as the ICF/ID safety net for the entire state of Idaho. (Dkt. 16.)

MEMORANDUM DECISION AND ORDER- 5

In support of the financial justification for its decision to close Kyler House, IDHW offers the following cost information:

- The average daily rate to house a resident at Kyler House in 2016 was $612.69.

- The average daily rate to house a resident at a community Intermediate Care Facility in 2016 was $245.32.

- The average daily rate of community based placements for the most intense adults with intellectual and developmental disabilities is $455.02 per day.

(Dkt. 16.)

At the time IDHW decided to close Kyler House, there were four individuals living there. (Dkt. 14.) All but L.T. have accepted transition plans to transfer them into community based residential settings. (Dkt. 14.)

Effective June 15, 2017, when Kyler House closes, all but four of the Kyler House staff will be laid off. (Dkt. 16.) The remaining four Kyler House staff members will help transition the Kyler House residents into their community-based settings. (Dkt. 16.)

## 3.    Impact of Closure of Kyler House: Plaintiffs' Perspective

On April 3, 2017, IDHW informed Plaintiffs in person that it would be closing Kyler House. (Dkt. 6-2.) IDHW followed this oral notice with a written Notice of Closure dated April 11, 2017. (Dkt. 6-2.) IDHW informed Plaintiffs that L.T. was eligible for placement in a certified family home, in supported living, or in another ICF/ID. (Dkt. 6.)

Since then, Plaintiffs have worked to find an alternative placement and provider for L.T. (Dkt. 6.) According to Plaintiffs, and their expert Dr. Derby, this alternative placement must meet two criteria: (1) the residential setting must be a highly structured ICF/ID facility and (2) L.T. must remain in the North Idaho area.

MEMORANDUM DECISION AND ORDER- 6

Because there are is not another ICF/ID option available to Plaintiff in North Idaho, Plaintiffs argue L.T. will have to be transferred to the SWITC in Nampa either immediately or after a community-based placement fails. (Dkt. 6, Dkt. 22.) Plaintiffs believe that moving L.T. away from Coeur d'Alene will be devastating for L.T. for a number of reasons. (Dkt. 6, Dkt. 6-6.) Fundamentally, change and transitions are extremely difficult for L.T. (Dkt. 6-6.) Moreover, L.T. will lose the extended school year services he receives in Coeur d'Alene, as well as regular access to his family, including his sisters, parents, and grandparents all of whom live in North Idaho. (Dkt. 6, Dkt. 6-6.) Presently, L.T. sees his sisters daily at school; he has weekly contact with his parents; and he regularly spends time with his grandparents. (Dkt. 6-6.)

**4.      Other Community Based Alternatives Available to L.T.**

IDHW offers expert testimony from Blake Blumfield, the Program Manager and former Clinical Supervisor for the Crisis Prevention and Court Services Team, Division of Family and Community Services ("FACS") at the IDHW (Dkt. 16) and Amanda DeYoung, current Clinical Supervisor for the Crisis Prevention and Court Services Team, FACS at the IDHW. (Dkt. 17.) Essentially, these agency experts offer two opinions: (1) L.T. is ready for a community based placement and (2) a community based placement is generally preferred to an ICF/ID placement because it is less restrictive. In addition, IDHW offers the supporting testimony of Amanda Barras, the North Hub Clinical Supervisor for the Crisis Prevention Team, FACS at the IDHW who describes IDHW's transition plan for L.T. and the efforts made to ensure that L.T. continues to receive the same supports and services at his new residence that he currently receives at Kyler House. (Dkt. 14.)

MEMORANDUM DECISION AND ORDER- 7

The goal of the Crisis Prevention Team is to "support[] people with developmental disabilities in the least restrictive environment possible." (Dkt. 16.) This means keeping people out of institutions and into long-term community placements and settings. (Dkt. 16.)

L.T. is eligible for the Idaho Adult Medicaid Developmental Disability Waiver ("DD Waiver") program which allows participants to choose a residential placement in a Certified Family Home, in Supported Living, or in another ICF/ID. (Dkt. 6, Dkt. 16.) Neither Plaintiffs nor Dr. Derby believe that a Certified Family Home or Supported Living are viable options for L.T. given his need for one-on-one care, 24 hours a day. (Dkt. 16.) However, IDHW offers expert witness testimony supporting IDHW's conclusion that L.T. can receive one-on-one care, 24 hours a day through a community-based placement, including a Certified Family Home or Supported Living option. (Dkts. 14, 16, 17.)

Furthermore, IDHW has a transition plan in place for L.T. (Dkt. 14.) This includes a move to a community-based residential setting and accessing supported living services through the DD Waiver program with an intense budget for supported living in the annual amount of $167,533.10. (Dkt. 14.)

The transition team has identified a house in Coeur d'Alene for L.T. that will be ready for him to occupy no later than June 15, 2017. (Dkt. 14.) L.T. will receive 24-hour support services there. (Dkt. 14.) IDHW's goal is to provide L.T. with the same supports and programs he received while a resident at Kyler House. (Dkt. 14.)

The specific plan is for L.T. to receive 24-hour residential habilitation supported living services through Renewed Horizons, a Developmental Disability agency in North Idaho. (Dkt. 14.) The target date for those services to begin is July 1 contingent upon

MEMORANDUM DECISION AND ORDER- 8

Renewed Horizons having appropriate staff to provide for L.T. (Dkt. 14.) In the meantime, L.T. will receive 24-hour care through two agencies: (1) 11 hours of hourly support per day from SL Start, an agency that provides habilitation services under a DD Waiver in North Idaho and (2) 13 hours of support from either A Better Personal Care agency (a personal care services provider) or from Kyler staff directly. (Dkt. 14.)

In addition, Kyler House staff will provide up to 16 hours per day of training to staff from SL Start and a Better Personal Care Agency for the first two weeks of L.T.'s transition to his new home. (Dkt. 14.) During this transition, the current supports and programs that L.T. receives from Kyler House will be transitioned to his new home. (Dkt. 14.) During the up to 16 hours per day of training, Kyler House staff will also provide L.T. with supplemental direct care to integrate him into his new home. (Dkt. 14.) This same transition plan will be followed during the first two weeks that L.T. transitions to staff support from Renewed Horizons. (Dkt. 14.)

L.T. will also have support through the IDHW Targeted Service Coordinator for linking, coordinating, and assisting with L.T.'s personal care services and DD Waiver services. (Dkt. 14.) IDHW will also be able to assist with safety planning, transitioning to supportive living services, and follow-up monitoring to ensure that L.T.'s needs are addressed in the least restrictive environment. (Dkt. 14.) In addition, during the transition period, L.T. will also have either a behavioral specialist or the IDHW Crisis Prevention Team available to take calls from L.T.'s new staff and family and to check in regularly to ensure L.T. and his new staff have what they need to ensure that L.T. is transitioned successfully into his new community based residential setting. (Dkt. 14.)

MEMORANDUM DECISION AND ORDER- 9

Plaintiffs argue that by moving L.T. into an inappropriate setting and then closing the only ICF/ID in Coeur d'Alene, IDHW is ensuring that L.T. will end up in a far more distant and restrictive ICF/ID in the future. (Dkt. 22.) According to Plaintiffs, closing Kyler House will inevitably lead to L.T.'s failure in a community-based setting and the next step in the chain of causation is necessarily institutionalization and isolation from the community. (Dkt. 22.).

## STANDARD OF REVIEW

The legal principles applicable to requests for temporary restraining orders and preliminary injunctions are well established and "substantially identical." *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A party seeking injunction relief must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *American Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008)).

Injunctive relief "is an extraordinary remedy, never awarded as of right." *Winter*, 555 U.S. at 24. The principal purpose of preliminary injunctive relief is to preserve the court's power to render a meaningful decision on the merits of the case by preserving the status quo pending a determination on the merits. 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2947 (2d ed. 2010); *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009).

MEMORANDUM DECISION AND ORDER- 10

The propriety of a request for injunctive relief hinges on a significant threat of irreparable injury that must be imminent in nature. *Caribbean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). Speculative injury does not constitute irreparable harm. *See id.; Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984). A presently existing actual threat must be shown, although the injury need not be certain to occur. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969); *FDIC v. Garner*, 125 F.3d 1272, 1279-80 (9th Cir. 1997), *cert. denied*, 523 U.S. 1020 (1998).

## ANALYSIS

### 1.  Probability of Success on the Merits

Plaintiffs argue that closing Kyler House will violate the integration mandate of Title II of the Americans with Disabilities Act (ADA) and Rehabilitation Act. For the reasons set forth below, the Court is not so persuaded.

The parties agree that IDHW must administer its Medicaid program, including its programs of services for those with severe developmental disabilities "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Olmstead v. L.C.*, 527 U.S. 581, 592 (1999). The parties disagree as to what this means for L.T. Plaintiffs argue that L.T. relies on the services of Kyler House to maintain independence, avoid remote institutionalization, and successfully reside in the community. Defendant argues that Kyler House is an institution and the integration mandate is one of the reasons why IDHW seeks to transition Plaintiff from Kyler House to a community-based program.

MEMORANDUM DECISION AND ORDER- 11

Title II of the ADA and Section 504 of the Rehabilitation Act both prohibit discrimination on the basis of disability. The ADA applies to public entities, whereas the Rehabilitation Act applies to federally-funded programs.

Title II of the ADA states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, the Rehabilitation Act states:

> No otherwise qualified individual with a disability in the United states . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

29 U.S.C. § 794(a).

To establish a violation of Title II of the ADA, a claimant must show that he or she: (1) is a qualified individual with a disability; (2) was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of his or her disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). To establish a violation of the Rehabilitation Act, a claimant must show that he or she: (1) is handicapped within the meaning of the Act; (2) is otherwise qualified for the benefit or services sought; (3) was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance. *Id.*

It is undisputed that, for the purposes of this dispute, the requirements of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a), are "co-extensive." *See Sanchez v. Johnson*, 416 F.3d 1051, 1062 (9th Cir. 2005); *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045, n. 11 (9th Cir. 1999).

As directed by Congress, the Attorney General issued certain regulations designed to implement the discrimination prohibitions of Title II of the ADA and the Rehabilitation Act. *See Olmstead*, 527 U.S. at 591-92. The integration mandate is set forth in these regulations. The Title II integration regulation states, "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* at 592 (quoting 28 C.F.R. § 35.130(d)). Similarly, the Rehabilitation Act integration regulation "requires recipients of federal funds to 'administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.'" *Id.* at 591-92 (quoting 28 C.F.R. § 41.51(d). "'[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities' . . . means[s] 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Id.* at 592 (citing 28 C.F.R. pt. 35, App. A, p.450 (1998)).

Based on these regulations, the United States Supreme Court in *Olmstead* recognized the unjustified isolation of people with disabilities constitutes discrimination based on disability. *Id.*at 597. In addition, the Supreme Court recognized a strong federal policy preference for community-based care. *Id.*

The *Olmstead* decision identified two public policy justifications underlying the preference for community integration as opposed to unjustified institutionalization:

> First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life . . . . Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Id.* at 600–01 (citations omitted).

Community-based care is part of an effort "to secure opportunities for people with developmental disabilities to enjoy the benefits of community living." *Id.* at 599. In determining whether an individual is "qualified" for community-based care, "the State generally may rely on the reasonable assessments of its own professionals." *Id.* at 602.

 Nonetheless, "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Id.* at 601-602. The integration mandate is for "qualified individual[s] with a disability." *Id.* at 602.

Furthermore, there is no requirement that community-based treatment be imposed on patients who do not desire it. *Id.* (citing 28 C.F.R. § 35.130(e)(1) (1998) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept"); 28 C.F.R. pt. 35, App. A, p. 450 (1998) ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation.")).

MEMORANDUM DECISION AND ORDER- 14

Plaintiffs argue that the decision to close Kyler House "will result in segregating L.T. from the broader, non-disabled community." (Dkt. 4-1.) Two assumptions underlie Plaintiffs' position: (1) L.T. requires an ICF/ID setting and (2) L.T. must be in Coeur d'Alene in order to avoid segregation from the non-disabled community. Plaintiffs essentially argue that moving L.T. from Kyler House to a community-based setting is a plan doomed to failure and will inevitably lead to further institutionalization of L.T. at SWITC in Nampa if there is no other ICF/ID option available in North Idaho. Plaintiffs argue, "If moving a person from an institution, into a community setting has the unintended but predictable consequence of placing him in a more restrictive setting, then such a move is prohibited by the ADA." (Dkt. 22.)

The Court does not find Plaintiffs' argument persuasive and finds it highly unlikely that Plaintiffs will succeed on the merits of their discrimination claim. Plaintiffs rely on the integration mandate in support of their disability discrimination claims. However, the integration mandate is precisely why L.T. is being transferred from Kyler House to a community based program. By transitioning L.T. to a community-based setting within Coeur d'Alene, Defendant has essentially maximized L.T.'s community integration. This decision alone simply cannot violate the integration clause or otherwise support a discrimination claim.

Other federal courts have rejected similar "obverse *Olmstead*" arguments wherein an individual challenges a state decision to close a treatment facility for the developmentally disabled or relocate such disabled individuals to community settings. *See Sciarillo v. Christie*, 2013 WL 6586569, * 4 (D. N.J. Dec. 13, 2013) (citing *Richard S. v.*

MEMORANDUM DECISION AND ORDER- 15

*Dep't of Developmental Servs. of the State of Cal.*, 2000 WL 35944246, *3 (C.D. Cal. Mar. 27, 2000); *Richard C. ex rel. Kathy B. v. Houstoun,* 196 F.R.D. 288, 292 (W.D. Pa. 1999); *Ill. League of Advocates for the Developmentally, Disabled v. Quinn,* 2013 WL 3168758, *5 (N.D. Ill. June 20, 2013). This Court agrees with the Central District of California's analysis of the issue:

> [T]here is no basis for saying a premature discharge into the community is an ADA *discrimination* based on disability. There is no ADA provision that *providing* community placement is a discrimination. It may be a bad medical decision, or poor policy, but it is not discrimination based on disability.

*Richard S.*, 2000 WL 35944246, *3.

Nonetheless, Plaintiffs argue that closure of the Kyler House violates the integration mandate because L.T. will likely fail in a community-based program and will ultimately end up at the ICF/ID facility in Nampa, far away from his friends and family and with the ultimate effect of discriminating against him on the basis of his disability. The Court finds this threatened injury is too remote and speculative to support a claim.

IDHW has developed a transition plan for L.T. to ensure his success in a community-based placement. This transition plan appears to reflect a great deal of effort, represents a tremendous dedication of resources for the direct benefit of L.T., and is supported by the expert opinion of IDHW's trained staff. It is also a reasonable accommodation of L.T.'s precise needs and a sufficient safeguard against the harm Plaintiffs seek to prevent by enjoining closure of Kyler House.

MEMORANDUM DECISION AND ORDER- 16

Ultimately, Plaintiffs request that L.T. receive ICF/ID services in Coeur d'Alene and that is effectively what Defendant's transition plan will achieve. While L.T. will not reside in an ICF/ED environment, such as Kyler House, Defendant has demonstrated that he will receive substantially the same level of care and support services in a new residential setting. Furthermore, because Defendant will have intense support on supported living services with one-on-one, 24-hour care, the Court is not persuaded that L.T.'s community placement is likely to fail.

While L.T. will likely experience some transitional stress from the change, the Court is convinced, based on the testimony of IDHW's experts, that L.T. will ultimately benefit from the new environment and requiring IDHW to continue to operate Kyler House for the benefit of a single resident is not a reasonable accommodation under the circumstances.

In short, the Court finds Plaintiffs are not likely to succeed on their claim that closing the Kyler House on June 15, 2017 as planned would violate the integration mandate of the ADA and Rehabilitation Act and result in unlawful discrimination.

## 2.      Irreparable Harm in the Absence of Relief

For an injunction to issue, Plaintiffs must demonstrate that L.T. is likely to suffer irreparable harm in the absence of injunctive relief. Although a plaintiff is not required to show actual harm at the preliminary injunction stage, a plaintiff "must establish that irreparable harm is *likely,* not just possible." *Alliance for the Wild Rockies,* 632 F.3d at 1131. The likely harm must be supported by a "clear showing," *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam), and speculative injury is insufficient, *Goldies Bookstore, Inc. v. Superior Court,* 739 F. 2d 466, 472 (9th Cir. 1984).

MEMORANDUM DECISION AND ORDER- 17

Plaintiffs, relying upon the expert opinion of Dr. Derby, argue that evicting L.T. will result in increased problem behaviors, loss of educational opportunity, and ultimately institutionalization. While this is the type of irreparable harm injunctive relief is designed to protect, the Court finds Plaintiffs' arguments do not survive careful scrutiny.

### A.    Disruptions Will Lead to Problem Behaviors

Plaintiffs argue that closing Kyler House as planned will result in an increase in L.T.'s behavior problems. The Court is sensitive to Plaintiffs' concerns and the impact this change may have on L.T. in the short term. Nonetheless, Plaintiffs argument has its limits.

First, literally, any change in L.T.'s environment has the risk of increasing L.T.'s problem behaviors. Yet it is not realistic to ask IDHW to provide L.T. with a completely static environment.

Second, L.T.'s living situation is going to be disrupted whether Kyler House is closed or not in light of the changes that have already occurred in anticipation of the planned June 15, 2017 closure. While the Court can enjoin the IDHW from closing Kyler House, it cannot force the other residents or the Staff, who have been notified of a pending lay-off, to remain on-site.

Third, there is expert testimony in the record from the IDHW that supports the conclusions that these short-term disruptions will likely lead to long-term gains for L.T. Accordingly, the short term harm Plaintiffs expect will not be permanent or irreparable.

### B.    Lost Educational Opportunities

The Court finds that the loss of educational opportunity is a limited concern under the circumstances.

MEMORANDUM DECISION AND ORDER- 18

First, Plaintiff is less than two months away from his 20th birthday. His educational opportunities through the Coeur d'Alene School District will end either in August 2017 or a year later. This is a relatively short period of time.

Second, while the Court recognizes that Dr. Derby believes this time is critical, the Court finds that the transition plan is set up in a way to address this concern. L.T. will continue to reside in Coeur d'Alene and remain eligible for the services he received through the Coeur d'Alene School District. While the transition may temporarily escalate L.T.'s problem behaviors, he will continue to receive intense support in his community placement. These accommodations will ensure that L.T. can continue to learn the life skills necessary for him to best succeed.

### C.    Institutionalization

Plaintiffs' institutionalization argument cuts both ways. Plaintiffs acknowledge that Defendant seeks to de-institutionalize L.T. and place him in a community-based program. They argue that they have demonstrated a "high probability" that closing Kyler House will ultimately result in further segregating L.T. from the non-disabled community. (Dkt. 22.) As discussed above, the Court finds that Defendant's transition plan will, in fact, result in greater deinstitutionalization and more expansive community integration. The Court is not convinced by Plaintiffs' argument that L.T. is destined to fail in that community placement. At most, this argument is too speculative to constitute irreparable harm.

In short, while the Court is mindful of the fact that change is hard for L.T., the Court is not convinced that, in the absence of their request for relief, L.T. will be irreparably harmed in the long-term. Rather, L.T. is being presented with a residential change and a

MEMORANDUM DECISION AND ORDER- 19

transition plan designed to ensure his long-term success and community integration in North Idaho.

**3.     Balance of Equities**

In balancing the equities, the Court must consider the parties' "competing claims of injury" and consider the effect granting or withholding preliminary injunctive relief will have on each party. *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987).

In this instance, Plaintiffs have made clear that they are concerned with the stress a change will cause L.T. The Court is sensitive to those concerns but, as previously stated, believes the IDHW experts have set forth a transition plan designed to address those concerns and minimize the disruption to L.T.

From the Defendant's standpoint, it made a decision to close Kyler House in at least April and has taken steps consistent with a plan for closing Kyler House by June 15, 2017. Accordingly, the other three residents have transition plans for new community-based placements and all but four of the Kyler House staff were informed that they would be laid off effective June 15, 2017. If the Court were to issue an injunction, IDHW would have to come up with a last-minute plan to staff and operate Kyler House for the benefit of a single individual, L.T.

Clearly, the financial and logistical challenges IDHW faces could be overcome. Nonetheless, in light of the short-term harm to L.T. and long-term gains the transition is designed for him to enjoy, the Court concludes that it makes little sense to require IDHW to continue to operate Kyler House under the circumstances.

MEMORANDUM DECISION AND ORDER- 20

4.      **Public Interest Concerns**

Both parties cite the public policy in favor of integration in support of their respective positions. As discussed above, the Court finds that this integration mandate is more likely to be achieved if Kyler House is closed and L.T. is transitioned to the community based placement described in the IDHW's transition plan.

Furthermore, the Court recognizes that the public also has an interest in providing its state agencies with the flexibility necessary to manage their finances and provide for the greatest good. IDHW has demonstrated that it made a choice to close Kyler House due to cost concerns. Further, it has an institutional offering for ICF/ID support as a last resort at the SWITC facility in Nampa, Idaho.

The Court recognizes Plaintiffs' concerns for L.T. and the distance of the SWITC facility in Nampa from L.T.'s family in North Idaho. However, the public interest weighs in favor of allowing IDHW to determine where to operate an ICF/ID facility. Such decisions cannot be made by the courts as a means of accommodating the needs of a single individual.

## CONCLUSION

In sum, the Court finds that neither a temporary restraining order nor a preliminary injunction should issue in this case. Because Plaintiffs are unlikely to prevail on their discrimination claims, the Court concludes that it would be unreasonable to order the IDHW to continue to operate Kyler House for the benefit of a single resident. While the closure of Kyler House may have a short-term impact on L.T., the Court finds the IDHW has set in place accommodations to ensure L.T.'s long-term success in the Coeur d'Alene

MEMORANDUM DECISION AND ORDER- 21

community so L.T. can enjoy access to the educational opportunities and family relationships that are vitally important to him.

<b>ORDER</b>

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiffs' Motion for Temporary Restraining Order and Injunction (Dkt. 4) is DENIED and Defendant's unopposed Request for Judicial Notice (Dkt. 11) is GRANTED.

DATED: June 14, 2017

Edward J. Lodge
United States District Judge

MEMORANDUM DECISION AND ORDER- 22